UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JUSTIN TRACY,                                )
                                             )
        Plaintiff,                           )
        vs.                                  )        1:04-cv-00619-TAB-DFH
                                             )
FINANCIAL INSURANCE                          )
MANAGEMENT CORPORATION,                      )
                                             )
        Defendant.                           )

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      Introduction.**

        Defendant Financial Insurance Management Corporation ("FIMC") hired Plaintiff Justin

Tracy as a regional account manager in April 2003, but terminated his employment less than six

weeks into his training.  Tracy asserts that FIMC violated the Americans with Disabilities Act

("ADA"), the Employee Retirement Income Security Act of 1974 ("ERISA"), and Indiana civil

rights law when it fired him after learning of his wife's obsessive compulsive disorder and

depression in May 2003.  Tracy also alleges intentional infliction of emotional distress.  FIMC

contends summary judgment is appropriate because Tracy's wife is not disabled and, in any

event, FIMC terminated Tracy for legitimate, work-related reasons.[1]

        Tracy filed a motion to strike some of the evidence on which FIMC relies in support of

its bid to obtain summary judgment.  For the reasons set forth below, Tracy's motion to strike is

DENIED and FIMC's motion for summary judgment is GRANTED.

---

[1] Defendant's request for oral argument [Docket No. 65] is denied.

## II.     Motion to Strike.

Tracy's motion to strike challenges three categories of documents proffered by FIMC in support of its summary judgment motion: (1) handwritten notes of FIMC director of training Christine Libertore; (2) typed notes of Libertore; and (3) an October 10, 2003 e-mail authored by FIMC's executive vice-president of operations David M. Shepherd.  [Docket No. 59, p. 2.] Tracy contends that Libertore's notes and Shepherd's October e-mail are not properly authenticated.  [Docket No. 60, pp. 2-3.]  Tracy further asserts that the October e-mail is inadmissible hearsay.  [Docket No. 60, p. 5.]  FIMC responds, in pertinent part, by submitting authenticating affidavits from Libertore and Shepherd.  [Docket No. 62, Ex. A, B.]

In ruling on a motion for summary judgment, the Court may only consider evidence that would be admissible at trial under the Federal Rules of Evidence.  *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  While it is true that the documents were not properly authenticated in the manner FIMC presented them, FIMC effectively cured this evidentiary deficiency by filing affidavits showing that the challenged documents are accurate copies of the documents Shepherd and Liberatore created.  Moreover, contrary to Tracy's contention, the documents are not offered to prove the truth of the derogatory statement contained therein, but rather as evidence that Tracy made such a statement (albeit one that Tracy -- and no doubt the individual singled out for this obloquy -- disputes).[2]  Accordingly, Tracy's motion to strike is denied.

_____

[2] The documents relate that, during a training session, Tracy referred to an audience member as a "bitch."

### III.   Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Militello v. Central States, Southeast and Southwest Areas Pension Fund,* 360 F.3d 681, 685 (7th Cir. 2004). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.'" *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 815 (7th Cir. 2002), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and draws all reasonable inferences in the light most favorable to the non-moving party. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). "Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, [Tracy] must respond to [FIMC's] motion with evidence setting forth specific facts showing that there is a genuine issue for trial." *Michael v. St. Joseph County*, 259 F.3d 842, 845 (7th Cir. 2001).

### IV.   Background.[3]

FIMC hired Tracy as a regional account manager on April 14, 2003. [Pl. Compl. ¶ 2.] Regional account managers provide sales and product training to financial institutions that use FIMC's products, and they may spend approximately 70% of their time giving presentations to client institutions. [Stavropoulos Dep. pp. 16-18.] FIMC provided health insurance as part of

---

[3] The facts are either undisputed or viewed in a light most favorable to Plaintiff, the non-moving party. In addition, this background section is an overview of the facts, not an exhaustive recitation of all material facts.

3

Tracy's benefits package.  [Tracy Dep. p. 37.]  Along with numerous other businesses, FIMC belongs to a "pooled" insurance plan provided by Blue Cross/Blue Shield.  [Dilley Dep. pp. 170-172.]  FIMC waived the ninety-day probationary period for Tracy's health insurance eligibility. [Tracy Dep. p. 37; Dilley Dep. pp. 54.]

During his training, Tracy solicited information about FIMC's health benefits from human resources representative Anmarie Wheeldon.  [Tracy Dep. p. 69.]  In 2003, FIMC's human resources department consisted of executive vice president of human resources Beth Dilley, Wheeldon, one-half of a trainer's time, and one administrative assistant for the department, all supervised by Dilley.  [Dilley Dep. pp. 30, 35-36.]  All personnel files and employee medical files were kept in Dilley's office.  [Dilley Dep. pp. 43, 73-74.]  Wheeldon worked out of a cubicle with no door, ten feet from Dilley's office.  [Dilley Dep. pp. 42-43; Wheeldon Dep. pp. 14-15.]  Dilley could communicate with Wheeldon without leaving her own office and Dilley and Wheeldon talked to each other several times a day.  [Wheeldon Dep. p. 14; Dilley Dep. p. 46.]

At the time Tracy accepted employment with FIMC, his wife Jill was at a clinic in Kansas receiving treatment for obsessive-compulsive disorder ("OCD") and depression, which was first diagnosed in 2000.  [Jill Tracy Dep. pp. 17-19, 23-24; Tracy Dep. p. 113.]  FIMC was not aware that Tracy's wife was diagnosed with either condition at the time it hired him.  [Dilley Dep. p. 55.]  Contemporaneous to his employment with FIMC, the OCD caused Tracy's wife to shower for up to one hour and forty-five minutes any time she had a bowel movement.  [Jill Tracy Aff. ¶¶ 10, 22.]  Tracy's wife was employed at the time Tracy worked for FIMC.  [Tracy Dep. p. 69.]  At the beginning of his employment with FIMC, Tracy told Dilley that his wife was

4

"ill" and "in need of a treatment center." [Dilley Dep. p. 202.]  Sometime during his training, he told Libertore that his wife was "sick." [Libertore Dep. p. 24.]  Tracy told his supervisor, David Daverio, about his wife's treatment for OCD before the end of his initial training period.  [Tracy Dep. pp. 112-13; Daverio Dep. p. 101.]  Daverio worked with Tracy to provide him training opportunities in Kansas where his wife was being treated.  [Tracy Dep. pp. 113-14.]

Immediately after he was hired, Tracy participated in FIMC's two-week training program at its headquarters in Sarasota, Florida.  [Tracy Dep. p. 6.]  FIMC used this training to impart information about its products and services as well as to teach new hires its sales techniques. [*Id.*]  Libertore personally observed Tracy during his training and mock presentations.  [Tracy Dep. Ex. 9.]  Libertore witnessed Tracy using his laptop computer during someone else's presentation, and the presenter told Libertore she thought Tracy's conduct was rude.  [*Id.*] Libertore addressed this issue with Tracy and told him that his conduct was unacceptable. [Tracy Dep. pp. 61-63,  Ex. 9.]  Other members of the training team complained to Libertore about Tracy's lack of professionalism.  [*Id.*]  Based on her initial conversations with Tracy, Liberatore determined that Tracy's attitude and personality might not be a good fit for the position.  [*Id.*]  She communicated her concern to Dilley before Tracy's two-week training ended.  [*Id.*]

During this two-week period, another trainer, Rico Dixson, told Tracy he was doing a good job.  [Tracy Dep. p. 92.]  After his third mock presentation, Libertore told him he did a great job and Dixon told him he did "great work" and "a good job, great job."  [*Id.* at pp. 100-01.]  They also told him his third mock presentation was an improvement from his previous presentations and gave him "high-fives".  [*Id.* at p. 101.]

5

However, during the remainder of his training Tracy made statements during presentations that brought complaints from others and generated further concern for his ability to meet FIMC's expectations.  [Tracy Dep. Ex. 9.]  Specifically, he responded to a colleague's comment by stating "that's stupid", and FIMC believed he used inappropriate language such as the word "bitch."  [Tracy Dep. pp. 91-92, Ex. 9.]  Libertore concluded that Tracy's attitude was cocky and detrimental to the nature of FIMC's business.  [*Id.*]  She was convinced that Tracy was not well suited for the FIMC position and communicated this as well to Dilley.  [*Id.*]

Dilley delegated hiring and termination decisions to her department managers.  [Dilley Dep. pp. 82-83.]  Dilley assisted with managerial decisions by coaching or counseling managers on any particular decision.  [Dilley Dep. p. 82.]  Daverio was Tracy's manager.  [Dilley Dep. p. 82.]  Daverio's compensation and bonus was based on, among other things, the overall performance of FIMC and the regional account managers that reported to him.  [Daverio Dep. pp. 10-11.]

Dilley recommended that Daverio terminate Tracy at the time Tracy completed his training in April.  [Dilley Dep. p. 82.]  However, Daverio was upset by the recommendation and opted instead to give Tracy another chance to prove himself.  [Daverio Dep. p. 68.]  On his last day of the initial training period, Dilley informed Tracy that he needed to select his words more carefully and that he had offended colleagues.  [Tracy Dep. p. 76.]  She further informed him that Shepherd believed Tracy had made inappropriate comments during Shepherd's presentation.  [Tracy Dep. p. 107; Dilley Dep. Ex. 14.]  She told Tracy her recommendation was to terminate him.  [Dilley Dep. p. 88.]  However, since Daverio remained confident that Tracy could be an FIMC representative, Daverio and Dilley extended Tracy's training period by an additional thirty

6

days.  [Tracy Dep. pp. 77, 106; Daverio Dep. p. 158.]  After the formal meeting with Dilley, Daverio, and Tracy, Daverio privately encouraged Tracy to just be himself and he would "get through this."  [Daverio Dep. pp. 101, 150; Tracy Dep. pp. 109-10.]

Before the thirty days expired, Tracy's performance in the field generated both positive and negative feedback.  Two other regional account managers, John Simpson and Nicolas Stavropoulos, who observed one of Tracy's presentations, told him he did a good job.  [Tracy Dep. pp. 136-37; Stravopoulos Dep. p. 120.]  Stavropoulos also told Daverio that Tracy did an "okay job" and still had room for improvement.  [Stravopoulos Dep. p. 124.]  Simpson also told Daverio that Tracy did a good job,[4] but also noted that his presentation needed a little bit of work, and he needed to learn his product and increase his confidence.  [Tracy Dep. p. 144; Simpson Dep. p. 29.]  Daverio received complaints about Tracy from clients and possibly one other FIMC employee.  [Dilley Dep. pp. 85, 284; Stravopoulos Dep. pp. 127-28; Daverio Dep. pp. 124-26.]

On or about May 9, FIMC held its company picnic, attended by both Daverio and Tracy.  [Daverio Dep. pp. 80-81, 173.]  Daverio did not recall discussing any performance-related matters with Tracy at that event.  [*Id*.]  However, by the second week in May, Daverio's confidence in Tracy's ability to fit in extinguished.  Daverio and Dilley -- whose recommendation that Daverio terminate Tracy remained consistent throughout Tracy's tenure -- discussed Tracy's future with FIMC.  [Daverio Dep. p. 69; Dilley Dep. pp. 83, 284.]

On or about Friday, May 16, Daverio and Dilley specifically discussed Daverio's desire

---

[4] Simpson denies telling Daverio that Tracy did a good job. [Simpson Dep. p. 29.] However, as is well recognized, the Court is obligated to construe the facts in a light most favorable to Tracy at this stage.

to terminate Tracy.  [Daverio Dep. p. 69; Dilley Dep. pp. 84-85.]  Dilley and Daverio believed

there was insufficient time in the business day to handle the termination on May 16, so they

decided to wait until Monday, May 19 to terminate Tracy.  [Dilley Dep. p. 86.]

On Monday, Daverio reported to Dilley that he had received a voice-mail message from

Tracy that his wife had "done something stupid" and that Tracy would need Monday, May 19 off

from work.  [Daverio Dep. p. 66; Dilley Dep. p. 86, lns. 17-21.]  In fact, Tracy's wife had

attempted suicide and was hospitalized at Porter Memorial Hospital in Valparaiso, Indiana.  [Jill

Tracy Dep. p. 40; Tracy Dep. p. 173.]  Tracy left a number where he could be contacted on

Tuesday, May 20.  [*Id*.]

On Monday, Tracy also contacted Wheeldon again several times for assistance with

insurance coverage, this time regarding the coverage by Blue Cross/Blue Shield related to his

wife's hospitalization after her suicide attempt.  [Tracy Dep. pp. 167-70, 172-73.]  Wheeldon

made an effort to be helpful, and told Tracy that Blue Cross/Blue Shield could not deny his claim

if his wife could show proof of prior coverage.  [Tracy Dep. p. 173.]  To obtain the proof of prior

coverage, Tracy, and possibly Wheeldon, contacted his wife's employer, Burns Veterinary

Supply ("Burns").  [Tracy Dep. pp. 169-70; Wheeldon Dep. p. 51.]  Burns faxed a proof of

coverage letter to Wheeldon and to Blue Cross/Blue Shield.  [Wheeldon Dep. pp. 49-53, Ex. 5;

Jill Tracy Dep. p. 48.]

With respect to Dilley and Daverio's knowledge of his wife's suicide attempt, Tracy

testified as follows:

> Q.    And did you tell them, whoever you told in your conversation on the 19th, about
> your wife's suicide attempt?
>
> A.    Yes, I believe I did.

> Q.     So is it your testimony that you had a conversation with somebody other than Anmarie Wheeldon on the 19th at FIMC in which you discussed your wife's suicide attempt?
>
> A.     I believe I did, yes.
>
> Q.     You believe you did or you know you did?
>
> A.     I don't recall if I did, but that was the only way they would have contacted me down at my sister-in-law's house if I would have given them that number.

[Tracy Dep. pp. 185-86.]

Using the number Tracy had provided in his voice-mail to Daverio, Dilley and Daverio called Tracy and terminated his employment on Tuesday, May 20.  [Daverio Dep. pp. 62-63; Dilley Dep. p. 88.]  After his termination, Tracy received information on continuing his insurance coverage through COBRA, but did not elect to continue his coverage.  [Tracy Dep. p. 179.]  Tracy never filed a claim with Blue Cross/Blue Shield for coverage of any of his wife's treatment.  [Tracy Dep. p. 275.]

**V.     Discussion.**

**A.     Discrimination or retaliation based on association**.

Although not raised until its summary judgment reply, FIMC argues as a preliminary matter that Tracy's claims are fatally flawed because his wife was not disabled at the time of his termination.  Because Tracy's claims falter on other grounds, it is not necessary to engage in a lengthy discourse concerning Jill Tracy's disability status at the time FIMC fired Tracy.  There is at least a disputed fact as to whether Jill Tracy was substantially limited in her ability to care for herself at the time FIMC terminated Tracy.[5]  *See Peters v. Baldwin Union Free School District*,

---

[5] Even if Jill Tracy had not attempted suicide at the time of Tracy's termination, she was diagnosed with OCD and depression, conditions that compelled her to take lengthy showers --

9

320 F.3d 164, 168 (2nd Cir. 2003) ("A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself.")

   1.   **Method of proof.**

   Tracy's ADA claim under 42 U.S.C. § 2112(b)(4), his ERISA claim pursuant to 29 U.S.C. § 1140, and his state law disability discrimination claim per Ind. Code § 22-9-5-7(4) hinge on his threshold allegation that FIMC terminated his employment because his wife was mentally ill and/or because he endeavored to obtain coverage for her treatment under his FIMC health benefits plan.  As with any other claim of discrimination or retaliation, a plaintiff making an association claim under these three theories may do so directly or indirectly.  Tracy contends that he can raise a triable issue of fact as to all three claims using the indirect method.  [Docket No. 58, pp. 18-19, 31.]  Tracy further argues that his ERISA claim can survive summary judgment under the direct method of proof because he has direct evidence of an ERISA violation.  [Docket No. 58, p. 30.]  This direct evidence, he asserts, is a "convincing mosaic" of circumstantial evidence.  [Docket No. 58, pp. 30-31.]

   Tracy's recitation and application of the law in this respect confuses "direct method" with "direct evidence."  The Seventh Circuit recently clarified this area of the law.  "The method of proving... discrimination by putting forth evidence of discriminatory motivation often is called the 'direct method'", which can be employed successfully by relying on "two types of evidence: direct or circumstantial."  *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 719 (7th Cir. 2005), *quoting Sheehan v Daily Racing Form, Inc*., 104 F. 3d 940 (7th Cir. 1997).  Tracy

_____

some up to 105 minutes long -- each time she had a bowel movement.  This in and of itself raises a material issue of fact regarding her ability to care for herself.

correctly articulates that "direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." [Docket No. 58, p. 30.] Tracy overlooks, however, that direct evidence is tantamount to an admission of discriminatory animus by the decision maker. *Id.* at 721. Tracy has no such evidence.

Rather, Tracy endeavors to string together "a convincing mosaic" of circumstantial evidence regarding the timing of his wife's suicide attempt, his request for assistance from FIMC's health benefits representative Wheeldon, and his termination. *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994) (recognizing that evidence of "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence . . . may compose a convincing mosaic of discrimination"). Tracy's direct path is littered with stumbling blocks that render this route impassable. First, Daverio, the foremost decision maker with respect to Tracy's termination, decided to terminate Tracy a day before his wife attempted suicide and three days before he contacted Wheeldon for assistance with a claim for benefits for his wife's hospitalization. Daverio's Friday, May 16, 2003 e-mail to Dilley inquiring whether to bring Tracy to Florida substantiates Daverio's testimony that he and Dilley arrived at their conclusion regarding Tracy's future with FIMC prior to Jill Tracy's suicide attempt. [Daverio Dep. Ex. 11.]

Second, Tracy presents no evidence that Daverio or Dilley knew of his wife's suicide attempt or solicitation of information from Wheeldon. Tracy's deposition testimony in this regard wavered from first stating he told FIMC representatives on May 19 about his wife's suicide attempt, to then stating he "believed" he did, to finally conceding that he could not recall

whether in fact he did.  [Tracy Dep. p. 185.]  Ultimately, Tracy speculates that FIMC must have known because that is "the only way they could have contacted me down at my sister-in-law's house if I would have given them that number."  [Tracy Dep. pp. 185-86.]  Such speculation by Tracy amounts to nothing more than his own subjective belief which is insufficient to create a genuine issue of material fact.  *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989).  Lastly, Daverio knew of Tracy's wife's OCD and prior hospitalization in Kansas weeks prior to Tracy's termination, had an opportunity to fire Tracy at the conclusion of Tracy's two-week training, but chose instead to support Tracy with thirty days of additional training.  Tracy's mosaic of circumstantial evidence crumbles under these uncontested facts and only the indirect method is available to him.

### 2.    Prima facie case of discrimination by association.

To sustain a prima facie case of disability discrimination by association under the ADA or Indiana civil rights law,[6] Tracy must establish that: (1) he was qualified for his position at the time he experienced an adverse job action; (2) he was subjected to an adverse employment action; (3) he was known by his employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative was a determining factor in the employer's decision.  *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 701 (7th Cir. 2004).  FIMC challenges the first, third, and fourth prongs of this four-part showing.

With respect to the first prong, FIMC contends that Tracy can not establish that he was

---

[6] *See Ind. Dept. Of Natural Resources v. Cobb*, 832 N.E.2d 585, 590 (Ind. Ct. App. 2005) (federal law framework used to analyze disparate treatment cases brought under Indiana Civil Rights provisions).

qualified for his position at the time FIMC terminated him because there "were numerous problems with [his] job performance from the first day of training." [Docket No. 56, p. 14.] In response, Tracy points to testimony from those who observed his presentations during his thirty-day extended training and stated that he did "okay" or "good." [Docket No. 58, pp. 19-21.] He also claims that Daverio had ample opportunity to address any shortfalls in his performance and instead remained silent until the day he terminated Tracy. At the very least, Tracy claims that he has raised a triable issue of fact in this regard. [*Id*. at p. 22.]

      Tracy's argument is persuasive. The record establishes a genuine question of fact concerning whether Tracy was qualified at the time he was terminated. FIMC points to the fact that Tracy's training was extended an additional thirty days. Further, Daverio testified that he received complaints from clients and colleagues of Tracy. The record evidence, however, shows that Daverio disagreed with Dilley and Libertore's assessment of Tracy after his initial two-week training and that Tracy deserved an additional chance. One of the colleagues who may have raised a complaint, Nick Stravropoulos, testified that he told Tracy he was doing a good job. Another colleague who observed one of Tracy's presentations, told Daverio that Tracy was doing a good job. Presented with this conflicting evidence, a reasonable juror could conclude that Tracy was qualified for the regional account manager position at the time he was terminated.

      Likewise, Tracy has raised a triable issue of fact concerning whether he was known by his employer at the time to have a relative or associate with a disability. Dilley and Daverio deny that they learned of Jill Tracy's suicide attempt until after Tracy was terminated. [Dilley Dep. pp. 66, 87; Devario Dep. p. 101.] Dilley even disavowed any knowledge of Jill Tracy's mental illness during Tracy's employment with FIMC. [Dilley Dep. pp. 66, 87.] However, early

in his employment with FIMC, Tracy told Dilley and Liberatore that his wife was sick and he told Daverio that his wife was seeking treatment for OCD at an in-patient treatment center in Kansas. Viewing these facts in a light most favorable to Tracy, a reasonable jury could conclude that FIMC knew his wife suffered from a disability at the time he was terminated.

The evidence is not as kind to Tracy with respect to the fourth prong. *Larimer* suggests that this element can be boiled down to a showing that the case falls into one of three categories in which an employer has a motive to discriminate against a non-disabled employee who is merely associated with a disabled person: (1) the associate has a disability that is costly to the employer because the associate is covered by the employer's health plan; (2) the associate has a disease, either communicable or genetic, which could be passed on to the covered employee; or (3) the employee is distracted at work due to the associate's disability. *Larimer*, 370 F.3d at 700-02. Similar to the plaintiff in *Larimer*, Tracy has no evidence that this case falls into any of these categories.

Tracy cannot show, much less argue credibly, that he could contract his wife's illness. Although he argues that he was distracted at work by his wife's mental illness, he fails to produce any evidence showing that he missed significant work hours or that his performance suffered. In fact, as noted above, he has successfully raised a question of fact regarding his job performance at the time he was terminated. Tracy comes closest to finding a fit with the first element, but does not show that his wife's treatment would have been covered by his health plan. In fact, Tracy enlisted the assistance of FIMC's human resource representative, Wheeldon, precisely because Blue Cross/Blue Shield indicated it would *not* cover his wife's treatment. The fact that Tracy did not pursue coverage under COBRA after his termination also belies any

argument that the employer would have incurred any cost relating to his wife's treatment. Additionally, there is no dispute that FIMC belonged to a pooled insurance plan and its claims history was but one of several factors that Blue Cross/Blue Shield used to determine premiums. [Dilley Dep. p. 170.]  There is no evidence that Tracy's benefits were a line item of any budget attributed to the unit in which he worked at FIMC.  Even if Blue Cross/Blue Shield ultimately had approved any claim from Tracy, the fact that FIMC waived Tracy's 90-day eligibility period and worked with him to maximize his family's coverage underscores FIMC's lack of concern regarding health benefit costs.  Thus, Tracy cannot fit any of these three categories. Consequently, Tracy cannot make a prima facie showing of disability discrimination under the ADA's association provision or Indiana civil rights law, and FIMC is entitled to summary judgment on these causes of action.

### 3. Prima facie case of ERISA retaliation.

Tracy asserts that FIMC violated Section 510 of ERISA, which prohibits an employer from discharging "a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan."  29 U.S.C. § 1140.  As addressed above, the only route of proof available to Tracy is the indirect one.  For plaintiffs proceeding along this path, the Seventh Circuit has recently expanded the application of the test articulated in *Stone v. City of Indianapolis Public Utilities Division*, 281 F. 3d 640, 644 (7th Cir. 2002), to this sort of ERISA claim.[7]  *Larimer*, 370 F.3d at 703.  Hence, Tracy can avoid summary judgment on his

---

[7] The Seventh Circuit more recently emphasized that a court "need not 'determine whether a plaintiff has established a prima facie case of discrimination where a defendant has advanced a legitimate, nondiscriminatory reason for its action.'"  *Isbell v. Allstate Insurance Company*, 418 F.3d 788, 796 (7th Cir. 2005) *quoting Lindemann v. Mobile Oil Corp.*, 141 F.3d 290, 296 (7th Cir. 1998).  FIMC has put forth such reasons for its termination of Tracy.

ERISA claim if he can raise a genuine issue of fact that: (1) he was a participant in an ERISA plan; (2) he was qualified for the position that he held; (3) he suffered an adverse employment action; and (4) no other similarly situated employee who was a participant of the subject plan was likewise terminated.

The first three elements warrant little discussion.  FIMC concedes that Tracy was a participant in a plan subject to ERISA and that he experienced an adverse employment action. As previously held, a triable issue exists regarding Tracy's job performance at the time FIMC terminated his employment.  As to the fourth element, however, FIMC argues that Tracy cannot show that some other similarly situated regional account manager was treated preferentially by FIMC, and the Court agrees.

Tracy directs the Court's attention to four regional account managers he claims are comparators: Steve Malan, Stravropoulos, Simpson, and Libertore.  Tracy must show that these individuals are directly comparable in all material respects.  *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005), *quoting Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  This he fails to do.  The record lacks any evidence from which the Court can conclude that any of these individuals were in their probationary training period.  In fact, the evidence establishes that Malan was beyond his probationary training period and had worked for FIMC for over one year.  [Dilley Dep. pp. 219, 221.]  The record is also wanting of any evidence from which the Court may conclude any of Tracy's comparators were accused of similar

---

Nevertheless, the Court finds it worthwhile to discuss Tracy's inability to raise a genuine issue of material fact regarding the non-existence of a prima facie case.

deficiencies as Tracy and not terminated by FIMC.[8]

**4.      Pretext**.

Even if Tracy had been able to make a prima facie showing of ADA, Indiana civil rights law, or ERISA violations, FIMC would remain entitled to summary judgment because Tracy cannot raise a genuine issue that the reason FIMC terminated him was pretextual.  FIMC articulated a legitimate reason for terminating Tracy's employment.  Namely, Daverio indicated that Tracy was fired after he received feedback from colleagues and customers that caused him to lose confidence in Tracy's ability perform as a regional manager during Tracy's extended thirty-day period.  Thus, the burden of production [9] shifts back to Tracy to raise a triable issue regarding the reason FIMC fired him.  *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Cullen v. Indiana University Board of Trustees*, 338 F.3d 693, 704 (7th Cir. 2003).

Endeavoring to show FIMC's reason was a mask for discriminatory animus, Tracy argues that: (1) FIMC never told him the complete reason he was fired until after he sued; (2) inconsistent testimony is sufficient to establish pretext; (3) Daverio's explanation regarding the timing of the termination is not credible; and (4) the suspicious timing itself exposes FIMC's reasons as pretext.  [Docket No. 58, pp. 23-27.]  The Court disagrees.

A plaintiff can defeat a motion for summary judgment on the issue of pretext by

---

[8] Ironically, even if Tracy had presented such evidence, Malan has no worth to Tracy's case as a comparator because, as it did with Tracy, FIMC fired him when he was unable to cure his deficiencies.  [Dilley Dep. pp. 221-22.]

[9] Though the Court refers to Tracy's burden to "show," "establish," or "demonstrate" prima facie cases or pretext, the Court recognizes that to survive summary judgment on any issue Tracy must only "show," "establish," or "demonstrate" that there remains a genuine issue of material fact.

producing evidence that calls into question the employer's proffered reasons for the employment decision. "This means the plaintiff must show by a preponderance of the evidence that the proffered explanation is false and that 'discrimination was the real reason' for the adverse employment action." *Volovsek v. Wisconsin Dept. of Agr., Trade and Consumer Protection*, 344 F.3d 680, 692 (7th Cir. 2003), *quoting St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993). To establish pretext, Tracy must demonstrate that FIMC's articulated reason for his termination: (1) had no basis in fact; (2) did not actually motivate its decision; or (3) was insufficient to motivate its decision. *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002); *Velasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001). Pretext does not mean a mistake, but rather, "'a phony reason for some action.'" *Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 640 (7th Cir. 2001), *quoting Russell v. Acme Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). *See also Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (plaintiff must demonstrate that an employer's proffered explanation for an employment decision is a dishonest explanation, rather than merely an error).

Tracy supports his position with conjecture and speculation regarding the reason for his termination, the timing of his termination, and inconsistent testimony by Daverio and Dilley over which date they decided to terminate Tracy, May 13 or 16. But, "discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by . . . speculating about the defendant's motives." *Visser v. Packer Engineering Associates*, 924 F.2d 655, 659 (7th Cir. 1991). Tracy takes issue with FIMC's lack of a detailed accounting of his performance deficiencies at the time he was fired but he presents no evidence showing that FIMC's explanation is false or a lie. FIMC's paucity of words in explaining itself to Tracy during his

termination, while understandably troubling to an employee, does not render the reason pretextual. *See Nese v. Julian Nordic Construction Company*, 405 F.3d 638, 642 (7th Cir. 2005) ( "to say that an employer was less than frank does not prove that the employer acted as it did for discriminatory reasons").

The fact that Daverio was fully aware of Jill Tracy's OCD and depression when Daverio decided to retain Tracy, and the lack of evidence that Daverio or Dilley knew of Jill Tracy's suicide attempt or Tracy's solicitation of information from Wheeldon at the time they terminated Tracy, supports the legitimacy of FIMC's conduct.   Further, any inconsistencies in testimony between Daverio and Dilley pertain to non-material facts concerning when they met in May to discuss his termination and what date they ultimately decided to terminate his employment. There is no dispute that Daverio and Dilley discussed Tracy's future with FIMC at some point during the second week of May, and on May 16 arrived at the conclusion to terminate him the following week.

Accordingly, Tracy can neither establish pretext nor raise a genuine issue of fact regarding pretext on any claim brought under the ADA, Indiana civil rights law, or ERISA,[10] and FIMC is entitled to summary judgment on those claims.

---

[10]   The facts of this case even arguably raise a presumption of non-discrimination/ retaliation, as Daverio was the primary decision maker with respect to retention at the end of Tracy's two-week period and with respect to his termination.  *See Chiaramonte v. Fashion Bed Group, Inc*., 129 F.3d 391, 399 (7th Cir. 1997) ( in instances where "an employee is hired and fired by the same decision maker in a relatively short time span, a presumption or inference, of non-discrimination arises").

**B.   Intentional infliction of emotional distress.[11]**

Tracy claims that FIMC intentionally inflicted emotional distress when it unlawfully terminated him within days of his wife's suicide attempt and that it is therefore liable under state common law.  [Docket No. 58, p. 34.]  "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another" commits the tort of intentional infliction of emotional distress.  *Cullison v. Medley*, 570 N.E. 2d 27, 31 (Ind. 1991), *quoting* Restatement (Second) of Torts § 46 (1965).  In practical terms, a former employee such as Tracy must show that his employer: (1) engaged in extreme and outrageous conduct that; (2) intentionally or recklessly; (3) caused; (4) severe emotional distress to another.  *Bradley v. Hall*, 720 N.E.2d 747, 752 (Ind. Ct. App. 1999).  "Extreme and outrageous" means that "which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Conwell v. Beatty,* 667 N.E.2d 768, 777 (Ind. Ct. App. 1996), *quoting* Restatement (Second) of Torts § 46 (1965).

FIMC argues that it is entitled to summary judgment on this remaining claim for a number of reasons including, there is no evidence that: (1) FIMC acted to cause Tracy harm; (2) FIMC's termination was extreme and outrageous; or (3) Tracy was severely emotionally distressed.  [Docket No. 56, pp. 25-26.]  The Court concurs.  Although Tracy asserts that his termination caused him to be embarrassed, humiliated, and the like, there is no evidence that would allow the Court to conclude that these matters were sufficiently severe.  Tracy further reported satisfaction

---

[11]   The Court exercises supplemental jurisdiction pursuant to 28 U.S.C. 1367 to resolve Plaintiff's remaining state claim.  *See Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997) (where "an interpretation of state law that knocks out the plaintiff's state claim is obviously correct, the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case").

in subsequent employment.  As such, it is beyond question that he did not suffer the requisite

serious mental distress contemplated by this theory of liability.  *See Ledbetter v. Ross*, 725 N.E.

2d 120, 124 (Ind. Ct. App. 2000) ("intentional infliction of emotional distress is found where

there is 'conduct exceeding all bounds usually tolerated by a decent society. . .'"), *quoting*

*Cullison v. Medley,* 570 N.E.2d 27, 31 (Ind. 1991).

Even if this Court were willing to accept that the termination caused a serious kind of

mental distress, there is no evidence that FIMC intended to inflict severe emotional distress upon

Tracy.  The fact that Devario successfully rebuked his supervisor's recommendation to terminate

Tracy at the conclusion of his two-week training is significant and undercuts any inference that

FIMC intended Tracy harm.  Finally, recognizing the repeated reminder from Indiana courts that

the requirements for this sort of claim are rigorous,[12] the Court declines to find outrageous and

extreme an employer's decision to terminate its business relationship with an employee it

believed did not meet its standards.  To hold differently might turn an otherwise common

termination into an actionable tort.  Thus, FIMC's motion for summary judgment is granted as to

Tracy's claim for intentional emotional distress.

**VI.    Conclusion.**

Because FIMC cured its evidentiary deficiencies by submitting authenticating affidavits,

Tracy's motion to strike [Docket No. 59] is denied.  With respect to FIMC's motion for summary

judgment, Tracy cannot make a prima facie showing of discrimination under any legal theory

---

[12] *Lachenman v. Stice*, 838 N.E.2d 451, 456-57 (Ind. Ct. App. 2005); *See also McCreary v. Libbey-Owens-Ford Co.* 132 F.3d 1159, 1167 (7th Cir. 1997) ("Indiana courts have been reluctant to award damages for intentional infliction of emotional distress in employment cases.")

pleaded in his complaint.  Even if he could, FIMC has articulated legitimate work-related reasons for Tracy's termination, and Tracy is unable to show those reasons are pretextual.  Similarly, Tracy fails to show that FIMC's conduct was outrageous and intended to inflict emotional harm on Tracy.  Thus, FIMC's motion for summary judgment [Docket No. 55] is granted with respect to all claims.  Final judgment shall be entered accordingly.  Each party shall bear its own costs.

Dated: January 13, 2006

Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

22

Copies:

Andrew Froman
CLARK DEMAY FARA & FROMAN P.A.
afroman@sarasotafirm.com

Byron L. Myers
ICE MILLER
myers@icemiller.com

Ryan Mccabe Poor
ICE MILLER
poor@icemiller.com

Jill S. Weinstein
PEDERSEN & WEINSTEIN LLP
jweinstein@pwllp.com